UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10116-RGS

UNITED STATES OF AMERICA

v.

ROBERT PROSPERI, GREGORY A. STEVENSON,
MARC J. BLAIS, and JOHN J. FARRAR

MEMORANDUM AND ORDER ON CALCULATION OF LOSS
FOR PURPOSES OF SENTENCING

May 6, 2010

STEARNS, D.J.

After a lengthy jury trial, defendants were convicted of various counts of mail fraud and highway project fraud and, with the exception of defendant Marc Blais, of conspiracy. The criminal charges arose out of a scheme to supply sub-standard or out-of-specification concrete to the federally-financed Central Artery Tunnel Project (CA/T).

The CA/T project, colloquially known as the "Big Dig," is a multi-billion dollar interstate highway construction project involving nearly eight miles of highway linking the City of Boston to north and south interstate highways and Logan Airport. Almost half of the project is underground, requiring the construction of tunnel walls, base slabs, and roof slabs made of concrete. The project specifications prohibited the addition of water to the concrete after it was mixed or "batched" (with some limited exceptions). The specifications also required that the concrete be installed within ninety minutes of batching (again with some limited exceptions). To enforce compliance with the ninety-minute rule, contractors were required to submit "batch reports" memorializing the delivery of each truckload of

concrete. The reports included the date and time of the batching. Contractors were warned that submitting false batch reports was punishable by criminal sanctions.

Defendants are former employees of Aggregate Industries, N.E. (Aggregate), a major concrete supplier to the CA/T. They were accused of recycling stale and adulterated concrete, and delivering it to the CA/T with false claims that it was in pristine condition. Approximately 500,000 concrete loads were delivered by Aggregate to the CA/T during the time period covered by the indictment. The jury found that roughly 5,000 of these loads failed to conform to contract specifications and that defendants knew it.[1]

Sentencing is now scheduled for the last week of May. Although post-<u>Booker</u>, the Sentencing Guidelines no longer have the near mandatory force they once had, they remain a significant influence in sentencing decisions and appellate court review. One of the goals of the Sentencing Guidelines was to give greater equivalence between penalties for white collar crimes like fraud and violent crimes like robbery. One means chosen by the Sentencing Commission to accomplish this goal was by giving greater weight to the amount of loss involved in a scheme to defraud.

There are many conceivable ways to measure loss. It can be measured in terms of the actual gain to the defendant, or obversely, by the actual loss to the victim (the two are not always equivalent).[2] It can be measured in terms of the loss intended to be inflicted (regardless of success), or as the amount of loss a defendant could reasonably

---

[1] The concrete supplied by Aggregate was not implicated in the July 10, 2006 Logan Airport tunnel collapse that killed Milena Del Valle, a transiting motorist.

[2] This is a case in point. Except in the most tangential sense, the defendants did not personally benefit from the scheme.

have foreseen occurring as a result of his conduct.  Finally, it could be calculated as the amount of loss that did occur regardless of a defendant's intent or reasonable expectations.  All of these measures of loss are discussed in the reported cases, and in the Sentencing Guidelines themselves.  See e.g. United States v. Bhutani, 266 F.3d 661, 670 (7th Cir. 2001); U.S.S.G. § 2B1.1 cmt. n.1-19.[3]

Here the government argues that the loss should be calculated in terms of the aggregate value of the contract price of each load of concrete delivered to the CA/T that might reasonably be counted as substandard.  The government explains its methodology as follows.

> Through analysis of Aggregate's 10/9 records and its computer records, as well as extrapolation from those records to include instances of fraud where there is an absence of records, the evidence suggests that approximately 5,319 loans of non-specification concrete were delivered to the CA/T between 1996 and 2005, the dates alleged in the conspiracies charged. Additionally, approximately 1,200 loads of non-specification concrete were delivered to other public highway projects during this time period.  These loads comprised approximately 64,163 yards of non-specification concrete at an average cost of $80.90 per yard yielding a total gross loss of approximately $5,191,103.

Gov't's Mem. at 4.  Alternatively, the government argues that the loss should be measured in terms of the amount that Aggregate paid to "endow" a fund to cover any future repairs

---

[3]Application Note 3(F)(v), on which the government relies, provides:

In a case involving a scheme in which . . . (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the . . . goods transferred, rendered or misrepresented, with no credit provided for the value of those items or services.

occasioned by failures of the concrete (should they occur).  By this measure, the loss is $27,146,191.

Defendants for their part argue (somewhat implausibly) that no loss at all occurred and that the figure to be used is $0.00.  The argument is not readily susceptible to a neat summary as it is based on defendants' reading of the evidence presented at trial, but its main themes are as follows:

1. "[T]he plain fact [is] that the Commonwealth got what it contracted for and what it expected to receive. . . . [T]est results showed the materials incorporated into the construction of the Big Dig met contractual requirements and conformed with applicable plans and specifications." Defs.' Mem. at 2.

2. "Defendants are aware of a single reported case involving highway program fraud where, like here, the false statements at issue did not involve costs." Id. at 7.  United States v. Clark, 193 F. App'x 562 (6th Cir. 2006).  "The Clark court held that in those circumstances, the measure of loss for the purpose of calculating the sentencing guidelines, was limited to the actual cost of the repairs necessary to remedy the inferior work.  Id. at 567-68.  Here, for all of the reasons set forth above, the overall concrete structures which incorporate the relatively small amounts of leftover concrete supplied by Aggregate meet or exceed contract specifications.  There simply is no evidence of repair or replacement costs attributable to inferior concrete or resulting from the false statements at issue." Defs.' Mem. at 7-8.

3. The government's theory of the case was one of non-economic harm, which is specifically excluded from the Sentencing Guidelines loss calculation methodology. Id. at 8.

4. The government's theory of defective loads of concrete is based on extrapolations that, according to the defendants, are simply the product of "pure speculation and skewed data." Id. at 11.

In sum, defendants alternatively cast the loss at $0.00, or as $917,333.19 (the government's "best case" according to defendants using extrapolations), or as $295,341.63 (the former figure less the number of loads that defendants contend were not

in fact out-of-specification).

Needless to say, much of this is not helpful. In a case like this it is difficult to apply a mechanical rule of sentencing. Loss is certainly important, but the crimes at issue do not fit the usual white collar crime profile. There was no intent on defendants' part to enrich themselves personally. Nor is there any evidence that defendants intended to do harm to the CA/T project or to the taxpaying public in any specific sense. What appears to have been at play was a corporate culture in which pressure, much of it self-generated, was exerted on defendants to perform service for the short-term benefit of the organization without heed to the moral consequences or public harm.[4]

Although neither the government or the defendants' methodology can be termed precise, I think on the whole the government's method of calculating loss is closest to the mark. I will adopt it, although with the caveat that I do not believe the estimated loss figure – given the nature of the case – has pivotal significance in fashioning an appropriate sentence, something that the parties might keep in mind in composing their sentencing arguments and recommendations.[5]

ORDER

For the foregoing reasons the court will for Sentencing Guidelines' purposes attribute to defendants Prosperi, Stevenson, and Farrar, a total loss figure of $5,191,103.

---

[4]This culture was summed up for the jury by defendants as conformity to "industry practice," a characterization that the jury rejected.

[5]I would ask that the parties make any written submissions no later than five (5) days prior to the scheduled sentencing dates.

For defendant Blais, the court will use the sum of $1,156,244.[6]

                                                SO ORDERED.

                                                /s/ Richard G. Stearns

                                                _____

                                                UNITED STATES DISTRICT JUDGE

---

[6] This lesser sum reflects Mr. Blais's later arrival in the scheme.